# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANTHONY LANE ARNOLD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-070-GKF-TLW |
| | ) | |
| CEVIN SMALLWOOD, individually, and | ) | |
| in his official capacity as Mayes County | ) | |
| Jailer, SHERIFF FRANK CANTEY, | ) | |
| Mayes County Sheriff, and the BOARD | ) | |
| OF COUNTY COMMISSIONERS for | ) | |
| MAYES COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION AND ORDER</u>

Before the court are the Motion for Summary Judgment of Defendant, Cevin Smallwood, Individually [#64] and the Motion for Summary Judgment of Defendant Board of County Commissioners, Sheriff Frank Cantey, in his Official Capacity, and Cevin Smallwood, in his Official Capacity [#63].

This § 1983 action arises from an incident that occurred while plaintiff Anthony Lane Arnold ("Arnold") was being booked into the Mayes County Jail on September 12, 2008. Arnold, a Locust Grove High School teacher and coach, was arrested at the Cherokee Casino (now Hard Rock Casino) in Catoosa by a tribal marshal for public intoxication and transported to the Mayes County Jail. Upon arrival, he was taken into the booking area to be processed by the chief jailer, Cevin Smallwood. Smallwood took him into a private room to be "dressed out," i.e. changed to jail clothing and to determine if he had any contraband. A scuffle ensued, during

which Smallwood kneed Arnold and used a taser on him.  Subsequently, Arnold was charged

with felony assault on a detention officer.  After a preliminary hearing, the state's case was

dismissed for lack of probable cause.  Plaintiff's teaching contract for the next school year was

not renewed.  He filed a claim pursuant to Oklahoma's Governmental Tort Claims Act, which

was denied.  Subsequently, he filed suit in this court against Smallwood, both individually and in

his official capacity, Sheriff Cantey, and the Board of County Commissioners of Mayes County,

asserting the following claims:

1. Use of unreasonable force in violation of his Fourth Amendment rights under 42
   U.S.C. § 1983, against Smallwood;

2. Use of unreasonable force in violation of his Fourth Amendment rights under § 1983,
   against Cantey (for failure to adequately train and supervise his jailers and jail
   supervisors);[1]

3. Negligence against all defendants;

4. Assault and battery against Smallwood;

5. Intentional interference with contractual relations against Smallwood.

[#2, Complaint].  He seeks actual and punitive damages.

Smallwood has filed a motion for summary judgment on all claims brought against him

in his individual capacity.  The Board of County Commissioners, Cantey and Smallwood (in his

official capacity) have filed a motion for summary judgment on all claims brought against them.

---

[1] The Complaint does not state whether Sheriff Cantey is sued in his individual or official capacity, or both.  However, based on the allegations, it appears Cantey is sued in both his individual and official capacities.

2

## I. Material Facts

1. In September 2008, Smallwood was a senior jailer, having been so employed by the Mayes County Sheriff's Department for approximately three-and-one-half years.  [Dkt. #64, Ex. 1, Preliminary Hearing Transcript, CF-08-202, 4:21-5:3; Ex. 2, Smallwood Aff., ¶1].

2. On September 12, 2008, Cherokee Marshal John Ketcher arrested plaintiff at the Cherokee Casino in Catoosa, Oklahoma, for public intoxication, and transported him to the Mayes County Jail.  [Dkt. #63, Ex. 2, Release Sheet; Ex. 3, Notice of Tort Claim; Ex. 4, Arnold Dep., 46:11-49:19, 79:6-86:1]. The incident reports of casino security officers stated that plaintiff had been playing blackjack and was cursing the dealer and other patrons.  He became involved in a verbal altercation with another patron.  He refused to leave the casino or to follow instructions of the security officers and had to be manually guided to the casino's security office.  [Dkt. #64, Exs. 4-5, Incident Reports].

3. Smallwood testified the Marshal telephoned ahead and told him he anticipated plaintiff was going to be a problem and "said something to the effect that they had to go hands on with him."  [Dkt #64, Ex. 2, Smallwood Aff., ¶2].

4. Plaintiff was booked into the Mayes County Jail on September 12, 2008, at approximately 10:54 p.m.  Plaintiff was released on bond on September 15, 2008, at approximately 2:03 p.m. [Dkt. #63, Ex. 2, Booking Sheet].

5.  Upon arrival at the jail, plaintiff was taken to the booking area to be processed by Smallwood and another jailer.  [Dkt. #64, Ex. 1., PH Trans., 7:6-24].  Smallwood testified Arnold was cursing, belligerent, combative, and would not follow orders.  [Dkt. #64, Ex. 2,

Smallwood Aff., ¶3].  Plaintiff denies Smallwood's characterization of his behavior, and testified he was "very cooperative."  [Dkt. #69, Ex. 2, Arnold Dep., 98:4-12].

6.  Smallwood testified plaintiff resisted efforts to take his photograph for the booking sheet and would not stand in the proper location.  His photograph was ultimately obtained.  [Dkt. #64, Ex. 1, PH Transc., 9:14-10:17].

7.  Smallwood took plaintiff to a private room to be "dressed out," i.e., changed to jail clothing, and to determine if there was any contraband in his clothing.  [Dkt. #64, Ex. 1, PH Trans., 11:1-10; Ex. 2, Smallwood Aff., ¶5].

8. In his affidavit, Smallwood stated he believed, based on his experience, that plaintiff's behavior was abnormal; he did not behave like a "typical prisoner who is intoxicated" and "continued to curse, was belligerent, aggressive and would not follow orders." [#64, Ex. 2, Smallwood Aff., ¶6].  Smallwood stated:

> Based on Mr. Arnold's actions, it was possible that Mr. Arnold was under the influence of drugs in addition to being intoxicated.  Because of his aggressive nature and refusal to follow orders, he was a potential threat to jail staff and other prisoners.  In my opinion, a strip search was appropriate under the circumstances to determine if Mr. Arnold had drugs or contraband.

[*Id.*].  However, plaintiff cites Smallwood's testimony from the preliminary hearing in support of his contention that Smallwood decided to strip search him because he strip searches *everyone*. [Dkt. #69, Ex. 3, PH Transc., 8:7-19].  Smallwood testified at the Preliminary Hearing that the policies and procedures "say inmates that get booked in the jail will be strip searched," that he has "some" discretion as to whether an incoming inmate gets strip-searched, and that he strip searches everyone except "[t]he ones that I know are going to be bonded right now." [*Id.,* 26:13-27:5].  He explained "[I]f I'm booking one in and I've got a bondsman waiting right there to bond him out, it's pointless to do so."  [*Id.,* 27:5-7].  He admitted he had not read the policy

regarding strip searches in "probably nine months," and was not "100 percent confident" the procedures in the policy manual say every inmate shall be strip searched.  [*Id.,* 27:10-16].  He testified that 90 percent of the inmates booked on misdemeanor charges are strip searched.  [*Id.* 28:22-29:10].  According to Smallwood, a strip search involves stripping the inmate down of all his clothes, checking inside their mouth, and requiring the inmate to bend over or squat and crouch with their "cheeks" apart so that "if they are trying to hide something in their anal cavity, hopefully, it will fall out."  [*Id.,* 65:19-66:15].

9. Smallwood testified he asked plaintiff to remove his clothing. Plaintiff complied with the exception of his underwear.  After multiple requests he pulled his underwear down, then quickly back up, several times.  [Dkt. #64, Ex. 1, PH Trans., 11:11-21].

10. Smallwood testified that because plaintiff refused to remove his underwear, he ordered him to turn around so his hands could be placed in handcuffs.  [*Id.,* 12:11-13:6].[2] Plaintiff refused to comply, so Smallwood attempted to secure plaintiff's arms to place him in handcuffs, but plaintiff pushed him away.  [*Id.,* 13:11-16]. Smallwood then "went to grab him and put him up against the wall."  [*Id.,* 13:17-21].  Smallwood testified plaintiff grabbed his shirt sleeve, but Smallwood "just held him up against the wall, then officers come in and we were somehow able to get him down on the floor."  [*Id.,* 14:1-23].  Plaintiff was on his back on the floor.  [*Id.,* 14:24-25].  Smallwood testified plaintiff was still holding his shirt and refused his

---

[2] Arnold testified that Arnold "put on a rubber glove, was having me take my underwear off, and I felt that there was going to be a cavity search" and that it is possible he told Smallwood, "You're not sticking anything up my butt."  [Dkt. #69, Ex. 2, Arnold Dep., 102:3-10].  He also denied that Smallwood told him, "Mr. Arnold, no one is sticking anything in your butt."  [*Id.,* 102:11-24].  Plaintiff also testified, "At one point I held [the underwear] to show him the pocket inside that he wanted to search, that there was nothing in there."  [*Id.,* 103:10-11].

order to let go, and tried to bite him.  [*Id.,* 15:7-16:23].[3]  Smallwood testified, "[T]hat's when I

knee struck him," with his right knee in plaintiff's left rib cage. [*Id.,* 16:23-17:2].  Smallwood

testified plaintiff was still holding his wrist and shirt, so he pulled away, told the two officers

with him (jailer Jacob Craig and Marshal Ketcher) to step back because he was going to tase

plaintiff,[4] and then shot plaintiff with a Taser. [*Id.,* 17:7-19].  Smallwood testified, "[A]fter I

tased him, he began to comply." [*Id.,* 17:24-25].[5] Smallwood searched plaintiff's underwear and

photographed and treated plaintiff's injuries. [*Id.,* 17:25-18:6]. He testified no further search was

conducted.  [Dkt. #64, Ex. 2, Smallwood Aff., ¶7]. Plaintiff was put in a detox cell, where he

remained for several hours, and was then moved to the general population of the jail.  [Dkt. #64,

Ex. 1, PH Trans., 18:11-16; Ex. 2, Smallwood Aff., ¶8].

  11.  Smallwood prepared an incident report and submitted it to the Mayes County District

Attorney for consideration of filing assault and battery charges.  The district attorney made the

decision to file formal charges and prosecute plaintiff for felony assault and battery.  [Dkt. #64,

Ex. 2, Smallwood Aff., ¶9; Ex. 5 On Demand Court Records, pp. 3-4].

  12.  A preliminary hearing was conducted on December 12, 2008, and plaintiff was

bound over for arraignment and trial.  Subsequently, the plaintiff filed a motion to quash the

---

[3] Plaintiff denies the he tried to bite Smallwood or that he pulled Smallwood's arm toward him.
[Dkt. #69, Ex. 2, Arnold Dep., 112:6-11].

[4] Arnold denies Smallwood announced his intention to tase him.  [Dkt. #69, Ex. 2, Arnold Dep.,
112:12-113:3].

[5] Smallwood testified on cross examination that he shot plaintiff with the Taser "and I don't
know if one missed or—I think one hit him in the hand and one hit him somewhere down lower,
and he wasn't complying and I drive [*sic*] stunned him once, I think."  [*Id.,* 87:19-88:6].  He
testified "dry stunning" involves taking the end of the Taser and touching it to the inmate's skin.
[*Id.,* 88:14-20].

bind-over order, which was granted, and the case was dismissed.  [Dkt. #64, On Demand Court Records, pp. 3-4, 6].

13.  Arnold was released from jail on September 15, 2008, at approximately 1 p.m.  He went to a doctor on September 16, 2008. The doctor observed bruising over the scapula and on his right anterior shoulder, tenderness to palpitation about his scalp and right ribs, and a taser mark on his right thigh.  An x-ray of his ribs was within normal limits.  The doctor issued prescriptions for muscle tension and for pain as needed.  Arnold had no further medical exams or treatment.  [Dkt. #64, Ex. 6, Medical Record of Mitchell J. Collier, M.D.; Ex. 8, Arnold Dep., 146:14-23].

14.  Locust Grove High School did not renew plaintiff's teaching contract for the following school term of 2009-2010.  David Wilkins, Jr., the school principal, testified he recommended to the superintendent that plaintiff not be rehired "because of his teaching abilities." [Dkt. #64, Ex. 7, David Wilkins Dep., 8:2-9, 32:21-23, 33:14-34:1].  Wilkins testified after plaintiff was notified he was not being rehired, Wilkins told plaintiff the decision was not based on what happened with the Police Department.  [*Id.,* 33:20-25].  Wilkins testified plaintiff would still have been terminated based on his school performance even if he had never been arrested or charged with a felony or a misdemeanor.  [*Id.,* 85:1-9].

15. The Mayes County Jail has a written policy which prohibits the strip search of an arrestee or inmate unless the jailer has a reasonable suspicion that the person possesses a weapon or contraband.  The policy requires the approval of the Jail Administrator or Shift Supervisor prior to the search.  The policy requires that the inmate and the jailer be of the same gender.  The policy further prohibits the touching of the inmate's body, the search of the inmate's body cavities or orifices, personal remarks regarding the inmate's personal or physical characteristics,

and the presence of other inmates during the search.  [Dkt. #63, Ex. 8, Mayes County Jail Policy, 2.15].

16. Sheriff Cantey testified he did not implement any unofficial policy, practice, or custom of strip searching all arrestees in the Mayes County Jail and he was not aware of the existence of any such unofficial policy, practice, or custom at the time of the incident giving rise to this lawsuit.  [Dkt. #63, Ex. 6, Frank Cantey Dep., 8:5-16, 34:5-9, 34:21-35:11, 36:4-9].  He testified that prior to the incident giving rise to this lawsuit, he had never received any complaints that the jail's written strip search policy was not being followed.  [*Id.,* 18:12-15, 40:18-25]. He testified he is now aware that jailers had not been following the written policy for years. [*Id.,* 34:5-36:9].

17.  The Mayes County Jail has a written use of force policy which provides that a jailer may use only that amount of physical force necessary to maintain or regain control of an inmate. The policy provides that physical force may be used only when an attack by an inmate on a facility employee, visitor, or other inmate is actually occurring, is clearly imminent, or when other lesser means have failed to achieve a legitimate and necessary objective.  The policy prohibits the physical punishment of inmates.  [Dkt. #63, Ex. 9, Mayes County Jail Policy, 4.08].

18. Smallwood testified that before the incident involving plaintiff, he had not received any other inmate complaints against him regarding the use of unreasonable force.  [Dkt. #63, Ex. 7, Smallwood Dep., 19:1-18].  At the time of the incident, he was CLEET certified and had received all required jailer training.  [*Id.,* 42:21-43:22].  He had reviewed the jail's written policies and procedures prior to the incident at issue.  [*Id.,* 45:17-46:80.].

19.  Sheriff Cantey did not recall ever receiving any inmate complaints regarding Smallwood.  [Dkt. #63, Ex. 6, Cantey Dep., 12:20-22].

8

## II. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden to show that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1984).

The non-moving party must set forth facts sufficient to establish the existence of a genuine issue for trial.  *Rocky Mountain Rogues, Inc. v. Town of Alpine,* 375 Fed. Appx. 887, 891 (10th Cir. 2010).  Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The mere existence of "a scintilla of evidence" in support of the non-moving party's position is insufficient.  *Id.*  To survive a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex,* 477 U.S. at 322.  The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury."  *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1402 (10th Cir. 1997) (quoting *Williams v. Rice,* 983 F.2d 177, 179 (10th Cir. 1993)).

### III. Analysis

### A. Smallwood's Motion for Summary Judgment

Plaintiff asserts claims against Smallwood, individually, for violation of his constitutional rights (Claim 1), negligence (Claim 3), assault and battery (Claim 4) and intentional interference with contractual relations (Claim 5).  Smallwood seeks summary judgment on all of plaintiff's claims against him in his individual capacity.

### 1. Constitutional Violations

Plaintiff claims Smallwood violated his Fourth Amendment rights by strip searching him and using excessive force against him during the booking process.  Smallwood asserts that the strip search of Arnold was reasonable under the circumstances because plaintiff was going into the jail's general population.  Further, he contends the use of force was reasonable under the circumstances.

### a. Strip Search

The Fourth Amendment prohibits "unreasonable searches." In *Bell v. Wolfish,* 441 U.S. 520 (1979), inmates at a federal short term custodial facility challenged the facility's practice of conducting strip searches and bodily cavity searches of all inmates after contact with visitors. The Supreme Court held that routine strip searching of pretrial detainees is not a per se violation of the Fourth Amendment.  In so ruling, the court stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559.  The court upheld a correctional institute's practice of subjecting each prisoner to a visual body cavity inspection after every contact visit with a person from outside the institution,

noting that inmate attempts to smuggle money, drugs, weapons and other contraband into the institute were documented on the record. *Id.*

In the years immediately following *Bell,* ten circuit courts of appeals—including the Tenth Circuit—applied the Supreme Court's balancing test to strip searches of individuals arrested for minor offenses, and found the searches unconstitutional where not supported by reasonable suspicion that the arrestee was hiding a weapon or contraband. *See Florence v. Bd. of Chosen Freeholders of the Co. of Burlington,* 621 F.3d 296, 303-304 and n. 4 (3d Cir. 2010). However, in the past decade the Eleventh, Ninth and Third Circuit (in *Florence*), reversed prior precedents and held that *Bell* authorizes a policy of blanket strip searches for all arrestees entering the general population of a jail. *See Id.* at 304-05 (citing *Powell v. Barrett,* 541 F.3d 1298 (11th Cir. 2008) (en banc) (overruling *Wilson v. Jones,* 251 F.3d 1340 (11th Cir. 2001)) and *Bull v. City and County of San Francisco,* 595 F.3d 964 (9th Cir. 2010) (en banc) (overruling *Giles v. Ackerman,* 746 F.2d 614 (9th Cir. 1984)).

The Supreme Court addressed the issue itself after it accepted certiorari in *Florence. Florence v. Bd. of Chosen Freeholders of Co. of Burlington,* 566 U.S. ___ (2012) (Slip Op.). There, petitioner Albert Florence was arrested during a traffic stop by a New Jersey state trooper who checked a statewide computer database and found a bench warrant issued for petitioner's arrest after he failed to appear at a hearing to enforce a fine. *Id.* at 2.   Florence was taken first to the Burlington County Detention Center where he was held for six days and then to the Essex County Correctional Facility, which is the largest county jail in New Jersey.  *Id.*  Burlington County jail procedures require every arrestee to shower with a delousing agent; officers check arrestees for scars, marks, gang tattoos and contraband as they disrobe.  *Id.*  Florence claims he

was also ordered to open his mouth, lift his tongue, hold out his arms, turn around and lift his genitals.  *Id.* at 3.

At the Essex County facility, arriving detainees were required to remove their clothing while an officer looked for body markings, wounds and contraband.   An officer, without touching the detainees, looked at their ears, nose, mouth, hair, scalp, fingers, hands, arms, armpits and other body openings. *Id.*   Essex County's policy applied regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history.  Florence alleged he was also required to lift his genitals, turn around, and cough in a squatting position as part of the process. *Id.*  Florence was released the next day, when charges against him were dismissed.

Florence sued the governmental entities that operated the jails, one of the wardens and other defendants in the United States District Court for the District of New Jersey, alleging the strip searches violated his Fourth and Fourteenth Amendment rights.  *Id.*  After discovery, the district court granted his motion for summary judgment on his Fourth Amendment claim, concluding that any policy of "strip searching" nonindictable offenders without reasonable suspicion violated the Fourth Amendment.  *Id.* at 4.  A divided panel of the Third Circuit reversed, holding that the procedures struck a reasonable balance between inmate privacy and the security needs of the jails.  *Id.* The Supreme Court granted certiorari.

As an initial matter, the court noted the imprecise nature of the term "strip search," commenting that it could mean anything from an instruction to remove clothing while an officer observes from a distance of five feet to a closer, more uncomfortable distance; it might include directing detainees to move or spread the buttocks or genital areas or to cough in a squatting

position.  *Id.* at 4-5.  There were no allegations that detainees were touched in any way as part of

the searches.  *Id.* at 5.

The court further observed that jails in the United States admit more than 13 million

inmates a year, the largest facilities process hundreds of people every day and smaller jails may

be overcrowded.  *Id.*  "Maintaining safety and order at these institutions requires the expertise of

correctional officials, who must have substantial discretion to devise reasonable solutions to the

problems they face." *Id.*  The court stated,

> There [are] many justifications for imposing a general ban rather than trying to carve
> out exceptions for certain detainees.  Among other problems, it would be a difficult
> if not impossible task to identify inmates who have propensities for violence, escape,
> or drug smuggling.  This [is] made even more difficult by the brevity of detention
> and the constantly changing nature of the inmate population.
>
> *   *   *
>
> The task of determining whether a policy is reasonably related to legitimate security
> interests is peculiarly within the province and professional expertise of correction
> officials … [In] the absence of substantial evidence in the record to indicate that the
> officials have exaggerated their response to these considerations courts should ordinarily
> defer to their expert judgment in such matters.

*Id.* at 7-8 (quotations and citations omitted).  Turning to the issue of strip searches, the court

stated:

> The question here is whether undoubted security imperatives involved in jail supervision
> override the assertion that some detainees must be exempt from the more invasive search
> procedures at issue absent reasonable suspicion of a concealed weapon or other
> contraband.  The Court has held that deference must be given to the officials in charge of
> the jail unless there is substantial evidence demonstrating their response to the situation is
> exaggerated.  Petitioner has not met this standard, and the record provides full
> justifications for the procedures used.

*Id.* at 9-10 (quotations and citations omitted).

In this case the court assumes, as plaintiff asserts, that Mayes County jailers had an

unwritten policy or practice of routinely conducting strip searches of all detainees headed for the

general jail population to search for contraband and drugs.  Based on *Florence,* the court finds

plaintiff has not demonstrated the practice is one that is an "exaggerated response" to  the risks

of contraband and drugs. Thus, to the extent plaintiff's Section 1983 claim is based on the strip

search, Smallwood in his individual capacity is entitled to summary judgment.

### b. Excessive Force

Unlike *Florence*—in which petitioner was never touched—the plaintiff in this case

contends the jailer used excessive force in the process of conducting the strip search.  Plaintiff

asserts the Fourth Amendment's "objective reasonableness" standard applies to this claim.

During the hearing on the summary judgment motions, counsel for defendants agreed. *See*

*Hewitt v. City of Truth or Consequences,* 758 F.2d 1375, 1377, n. 2 (10th Cir. 1985) (citing *Bell,*

441 U.S. at 575, n. 16). ("The Eighth Amendment does not apply until after an adjudication of

guilt."); *Austin v. Hamilton,* 945 F.2d 1155, 1160 (10th Cir. 1991), (holding that the Fourth

Amendment's strictures apply to alleged post-arrest use of excessive force on an arrestee

detained without a warrant).  Thus, the standard in this case is whether Smallwood's use of force

during the strip search was "objectively reasonable."

Plaintiff asserts that in light of the written jail policy prohibiting strip searches except

where the jailer has a reasonable suspicion that the person possesses a weapon or contraband,

Smallwood's order to strip was itself a display of excessive force, as was every action he took to

force compliance with the order.  The court rejects the proposition that Smallwood's command

to plaintiff was automatically a violation of plaintiff's Fourth Amendment right.  *See Porro v.*

*Barnes,* 624 F.3d 1322, 1329 (10th Cir. 2010) (plaintiff bears the burden of proving that the

*Constitution*, and not merely a policy, has been violated by a jailer's conduct).

However, considering—as it must—the evidence presented in the light most favorable to plaintiff, the court finds there is a genuine dispute of fact regarding whether the amount of force Smallwood used in the process of the strip search was objectively reasonable.  Plaintiff asserts he pulled his underwear up and down several times in response to Smallwood's directive to remove them, that although he resisted taking off his underwear, he did not attempt to bite Smallwood, and that Smallwood did not announce his intention to use the Taser on him.

Smallwood also contends that plaintiff's claim fails because he cannot show actual injury from the alleged use of excessive force.  "[A] claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional." *Cortez v. McCauley,* 478 F.3d 1108, 1129 (10th Cir. 2007).  "[P]roof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element of an excessive force claim, though the absence of injury in the context of the totality of the circumstances may suggest the absence of excessive force." *Id.*

The doctor who treated plaintiff the day after the incident observed bruising over the scapula and on his right anterior shoulder, tenderness to palpitation about his scalp and right ribs, and a taser mark on his right thigh.  The doctor issued prescriptions for muscle tension and for pain as needed.  The court finds plaintiff has presented evidence of more than de minimus injury.  Therefore, Smallwood's argument regarding injury must be rejected.

Although the court finds the issue to be a close call, it concludes that genuine disputes of material fact preclude summary judgment in favor of Smallwood on plaintiff's claim for use of excessive force.

### 2. Qualified Immunity

Smallwood asserts he is entitled to summary judgment on plaintiff's constitutional claim based on the doctrine of qualified immunity.  The summary judgment standards for a claim of

15

qualified immunity are subject to "a somewhat different analysis from other summary judgment

rulings." *Toevs v. Reid,* 646 F.3d 752, 755 (10th Cir. 2011).  The Tenth Circuit has stated:

> The doctrine of qualified immunity shields government officials performing
> discretionary functions from liability for damages insofar as their conduct does
> not violate clearly established statutory or constitutional rights of which a
> reasonable person would have known.  Thus, to avoid judgment for the
> defendant based on qualified immunity, the plaintiff must show that the
> defendant's actions violated a specific statutory or constitutional right, and
> that the constitutional or statutory rights the defendant allegedly violated
> were clearly established at the time of the conduct at issue.  [The court] may
> address these questions in whatever order is appropriate under the circumstances.
> [The court] view[s] the facts in the light most favorable to the plaintiff. …

The court has determined a genuine issue of material fact exists about whether

Smallwood violated right against use of excessive force.  Thus, the court's inquiry shifts to the

question of whether the constitutional right was clearly established at the time of the conduct at

issue.

For the law to be clearly established, there must be a Supreme Court or Tenth Circuit

decision on point, or the clearly established weight of authority from other courts must be as

plaintiff maintains.  *Foote v. Spiegel,* 118 F.3d 1416, 1424 (10th Cir. 1997).

The "objective reasonableness" standard for pretrial detainees' excessive force claims is

not new; it has been the rule in this circuit since 1991.  *See Austin, supra.*  Therefore, the court

rejects defendant's claim of qualified immunity.

### 3. Negligence and Assault and Battery Claims

Smallwood seeks summary judgment on plaintiff's negligence and assault and battery

claims against him.  Plaintiff did not respond to Smallwood's motion regarding the tort claims.

Oklahoma's Governmental Tort Claims Act ("GTCA") states:

> The State of Oklahoma does hereby adopt the doctrine of sovereign immunity.
> The State, its political subdivision, and all of their employees acting within
> the scope of their employment, whether performing governmental or proprietary

functions, shall be immune from liability for torts.

51 O.S. § 152.1(A).  An employee is defined as "any person who is authorized to act in behalf of

a political subdivision or the state whether that person is acting on a permanent or temporary

basis, with or without being compensated or on a full-time or part-time basis."  51 O.S. § 152(b).

"Scope of employment" means:

> performance by an employee acting in good faith within the duties of the employee's
> office or employment or of tasks lawfully assigned by a competent authority including
> the operation or use of an agency vehicle or equipment with actual or implied consent
> of the supervisor of the employee, but shall not include corruption or fraud.

51 O.S. § 152 (11).  Further, the GTCA requires all lawsuits be brought against the state or

political subdivision and bars actions against an "employee of the state or political subdivision

acting within the scope of his employment." 51 O.S. § 163(C).  Under the GTCA, the

governmental entity "assumes liability for loss resulting from the torts of its employees acting

within the scope of their employment and such liability is exclusive and in place of all other

liability of an employee at common law or otherwise." *Shephard v. CompSource, Oklahoma,* 209

F.3d 288, 294  (Okla. 2009).

Plaintiff's claim against Smallwood for negligence is precluded by the GTCA.  His

claims for assault and battery and intentional interference with contractual relations are not

precluded by the GTCA, because, in order for plaintiff to prevail upon those claims, he must

stablish Smallwood acted outside the scope of his employment, as discussed in § III.B.4, below.[6]

---

[6] As noted in Section II.A.4. below, Smallwood is entitled to summary judgment on plaintiff's
claim for intentional interference with contractual relations because plaintiff has failed to come
forward with evidence establishing Smallwood's alleged conduct proximately caused the
nonrenewal of plaintiff's teaching contract.

### 4. Interference with Contractual Relations

To establish a claim for interference with contractual relations, a plaintiff must prove (1) that he had a business or contractual right that was interfered with; (2) that the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable; and (3) that damage was proximately sustained as a result of the complained-of interference. *Mac Adjustment, Inc. v. Property Loss Research Bureau,* 595 P.2d 427, 428 (Okla. 1979). The principal of Locust Grove High School testified plaintiff's teaching contract was not renewed based on performance issues, and the subject incident was not the cause of the nonrenewal decision. Plaintiff has come forward with no evidence to the contrary. Therefore, Smallwood is entitled to summary judgment on plaintiff's claim for interference with contractual relations.

### B. Motion for Summary Judgment of Board of County Commissioners, Sheriff Frank Cantey in his Official Capacity, and Cevin Smallwood, in his Official Capacity

### 1. Section 1983 Claim Against Board of County Commissioners

The Board of County Commissioners (the "Board") asserts that it cannot be held liable for alleged § 1983 violations. Pursuant to Oklahoma statutes, the Sheriff is an independently elected official and is the chief law enforcement official of the county. 19 O.S. §§ 181, 516. Furthermore, the Sheriff is the only elected official charged with keeping the county jail and the custody of the jail inmates. 19 O.S. § 513. Additionally, under 19 O.S. § 547, the Sheriff is responsible for the acts of his undersheriff and deputy sheriffs. Because the Board of County Commissioners has no statutory duty with respect to the management of the jail, it cannot be held liable for the jailer's alleged use of excessive force. *See Meade v. Grubbs,* 841 F.2d 1512, 1528 (10th Cir. 1988); *Jantzen v. Hawkins,* 188 F.3d 1247, 1249 (10th Cir. 1999).

Plaintiff concedes he is not seeking relief against the Board under §1983.  Therefore, the Board is entitled to summary judgment on plaintiff's claims for constitutional violations.

### 2. Section 1983 Claim Against Smallwood in his Official Capacity

Smallwood contends he is entitled to summary judgment on plaintiff's claim against him in his "official capacity."  "A municipality cannot be liable under § 1983 for acts of a municipal official in his official capacity "unless the official possesses final policymaking authority to establish municipal policy with respect to acts in question." *Jantzen,* 188 F.2d at 1249 (quoting *Houston v. Reich,* 932 F.2d 883, 887 (10th Cir. 1991).  As set forth above, the Sheriff is responsible in his official capacity for the acts of his employees.  Smallwood has no final policy-making authority with regard to the operation of the Mayes County Jail.  Therefore, Smallwood is entitled to summary judgment on plaintiff's claim against him in his official capacity.

### 3. Section 1983 Claim Against Cantey

### a. Official Capacity Claim

Sheriff Cantey contends he is entitled to summary judgment on plaintiff's § 1983 claim against him in his "official capacity."  An official capacity suit is, in all respects other than name, to be treated as a suit against the entity.  *Griess v. Colorado,* 841 F.2d 1042, 1045 (10th Cir. 1988).  Municipal entities are subject to § 1983 liability, but not on the basis of *respondeat superior.  Monell v. Dept. of Social Services,* 436 U.S. 658, 690-91 (1978).  Rather, liability may be imposed under § 1983 only when the violation of the plaintiff's federally protected right can be attributable to the "execution of a municipal policy or custom, whether by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Id.* at 694.

The Tenth Circuit, applying *Monell* and its progeny, has stated:

Liability under section 1983 cannot rest upon the doctrine of *respondeat superior.* A direct causal link must exist between the acts of the governing body sought to

19

be held liable and the alleged constitutional deprivation.  Such a causal connection may be established when the governing body has delegated its decision-making authority to the official whose illegal conduct caused the harm, or when the government body retains its decision-making authority but exercises it with deliberate indifference to the constitutional rights of those affected by its decisions.

*Houston v. Reich,* 932 F.2d 883, 888 (10th Cir. 1991) (quotations and citations omitted).

Similarly, § 1983 supervisory liability may not be based on *respondeat superior*, but only on the supervisor's own wrongful acts or omissions.  *Monell,* 436 U.S. 658, 694, n. 58.[7]  The Tenth Circuit has held that the test for supervisory liability under § 1983 requires "allegations of personal direction or actual knowledge and acquiescence." *Lankford v. City of Hobart,* 73 F.3d 283, 287 (10th Cir. 1996).  *See also, Woodward v. City of Worland,* 977 F.2d 1392, 1400 (10th Cir. 1992), *cert. denied,* 509 U.S. 923 (1993).  In order for a § 1983 plaintiff to prevail on an official capacity claim for failure to train or supervise, he must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers … can reasonably be said to have been deliberately indifferent to the need for additional training."  *Jenkins v. Wood,* 81 F.3d 988, 994 (10nth Cir. 1996).

The plaintiff also contends the Sheriff is liable in his official and individual capacity because he knew or should reasonably have known Smallwood was violating the jail's written policy against strip searching inmates without reasonable suspicion.  *Porro* instructs otherwise. Even assuming the Sheriff  knew or should have known of the policy violation, "the failure to enforce a prophylactic policy imposing a standard of care well in excess" of constitutional

---

[7] "When supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir. 1987).

requirements is not enough by itself "to create a triable question over whether county officials were deliberately indifferent to the Constitution." *Id.,* 624 F.3d at 1329-30.[8]

Here, Sheriff Cantey has introduced evidence that the Mayes County Jail has a use of force policy which provides a jailer may use only the amount of physical force necessary to maintain or regain control of an inmate. The policy prohibits the physical punishment of inmates. The Sheriff did not recall ever receiving any inmate complaints regarding Smallwood before the incident involving plaintiff. Smallwood testified that before the incident, he had not received any other inmate complaints against him regarding the use of unreasonable force; he was CLEET certified and had received all required jailer training; and he had received and reviewed the jail's written policies and procedures. Plaintiff produced no evidence controverting Cantey's or Smallwood's testimony.

Therefore, the court concludes Sheriff Cantey is entitled to summary judgment on plaintiff's claim against him in his official capacity.

### b. Individual Capacity Claim

In order to maintain a claim of supervisory liability against Sheriff Cantey in his individual capacity under 42 U.S.C. § 1983, a plaintiff must allege sufficient facts to show that he may plausibly establish "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson,* 614 F.3d 1185, 1199 (10th Cir. 2010).

---

[8] In *Porro,* an immigration detainee alleged a claim for supervisory liability against the sheriff of Jefferson County, Oklahoma, based on jailers' use of a taser on him in violation of a putative federal policy completely banning the use of tasers on immigration detainees. The Tenth Circuit, applying a Fourteenth Amendment due process standard, rejected the detainee's position that "the putative federal policy and the Constitution are congruent," or that the failure to abide by the policy amounted to "automatic or *per se* proof of deliberate indifference." *Id.* at 1329.

Section 1983 authorizes neither strict liability nor *respondeat superior* liability.  *Porro,* 624 F.3d

at 1327.  Rather, to establish a § 1983 by the Sheriff, "plaintiff must establish a deliberate,

intentional act on the part of the defendant to violate the plaintiff's legal rights." *Id.* at 1327-28.

(quotation and brackets omitted).

 As indicated above, Sheriff Cantey  introduced evidence that the Mayes County Jail has a

use of force policy which provides that a jailer may use only the amount of physical force

necessary to maintain or regain control of an inmate and prohibiting the physical punishment of

inmates.  The sheriff received no complaints of Smallwood using excessive force before the

incident giving rise to this suit. Smallwood had not received any other inmate complaints against

him of unreasonable force; he was CLEET certified and had received all required jailer training;

and he had received and reviewed the jail's written policies and procedures.  Plaintiff produced

no evidence controverting Cantey's or Smallwood's testimony.

 The court concludes plaintiff has failed to produce evidence satisfying the requirements

set out in *Dodds* and *Porro.*  Therefore, the sheriff is entitled to summary judgment on plaintiff's

§ 1983 claim against him in his individual capacity.

### 4. State Law Tort Claims

 The Board[9] and Cantey assert they are entitled to summary judgment against plaintiff on

his remaining GTCA claims for negligence, assault and battery and intentional interference with

contractual relations.[10]

---

[9] The Board does not assert it is an improper defendant with respect to the state law tort claims.

[10] Only Smallwood is named in Count IV (assault and battery) and Count V (intentional
interference with contractual relations).  However, plaintiff contends the Board of County
Commissioners and Cantey are also liable under the GTCA for Smallwood's alleged torts.

**a. Assault and Battery and Intentional Interference with Contract Claims**

The court granted Smallwood's motion for summary judgment on the intentional interference with contractual relations claim. Therefore, Cantey and the Board are also entitled to summary judgment on the claim.

Additionally, Cantey and the Board contend plaintiff's claims against them for assault and battery and intentional interference with contractual relations are precluded because both torts require bad faith conduct by Smallwood, which, if proven, would mean Smallwood was acting outside the scope of his employment.

The GTCA defines "scope of employment" to mean "performance of an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority …" 51 O.S. § 152(11).  Municipalities may be liable for certain intentional torts committed by employees acting within the scope of their employment. *See  Nail v. City of Henryetta,* 911 P.2d 914, 917 n. 8 (Okla. 1996).  Consequently, in order to determine whether the Board is immune from plaintiff's claims for assault and battery and intentional interference with contractual relations, the court must consider the elements of each tort to determine whether bad faith must be proven to make out a prima facie case.  *Craig v. City of Hobart,* 2010 WL 68-857 (W.D. Okla.) (unpublished opinion).

Oklahoma follows the definitions of assault and battery set forth in the Restatement (Second) of Torts.  *See Brown v. Ford,* 905 P.2d 223, 229, n. 34 (overruled on other grounds):

(1) An actor is subject to liability to another for assault if

> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>
> (b) the other is thereby put in such imminent apprehension.

Restatement (Second) of Torts § 21 (1965).  Regarding battery, the Restatement (Second) states:

> An actor is subject to liability to another for battery if
>
>> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and
>>
>> (b) a harmful contact with the person of the other directly or indirectly results.

Restatement (Second) of Torts § 13 (1965).  Both torts require an intent to cause a harmful or offensive contact; therefore, neither can be committed in good faith.  *Brown,* 905 P.2d 229.[11]

As previously discussed, the tort of intentional interference with contractual relations requires malicious and wrongful interference that was neither justified, privileged nor excusable. *Mac Adjustment,* 595 P.2d at 428.  Thus, it cannot be committed in good faith.

---

[11] Plaintiff argues that under *Bryson v. Oklahoma Co.,* 261 P.3d 627 (Okla. 2011), the issue of whether the GTCA precludes his assault and liability claim against the county is a jury question. Plaintiff's reliance on *Bryson* is misplaced.  There, the court in *dicta* observed that with respect to the law of respondeat superior, the determination of whether an employee was acting within the scope of employment is generally a question of fact.  *Id.* at 632.  However, it never reached the issue of whether plaintiff's claim of assault and battery was precluded by the GTCA. *Id.* Instead, it affirmed the trial court's grant of summary judgment in favor of the county on the claim because the only basis on which it could be held liable was respondeat superior and plaintiff had dismissed his claims against the employee who allegedly committed the assault and battery.  *Id.* at 633.  *Morales v. City of Oklahoma City,* 230 P.3d 869 (Okla. 2010), in contrast, suggests the Oklahoma Supreme Court recognizes assault and battery claims are precluded by the GTCA.  There, plaintiff's minor daughter suffered a broken arm when an Oklahoma City police officer tried to break up a fight at a school.  In her original petition against the city and police department, plaintiff alleged that the officer, acting within the scope of his employment, "used excessive force, acted negligently, intentionally, maliciously, and in reckless disregard of her daughter's safety," in breaking up the fight.  *Id.* at 873.  The city filed a motion to dismiss on the grounds that allegations of intentional, malicious and reckless conduct on their face took the officer's conduct outside the scope of his employment, thereby relieving the City of liability for his actions. *Id.*  In response, plaintiff filed an amended petition which removed all descriptive allegations of the officer's conduct, replacing them with a non-specific allegation of tort-inflicted damage to the girl caused by the officer's actions taken within the scope of his employment.  *Id.* The court noted that under the GTCA, the City could not be held liable for acts or omissions of its employees acting outside the scope of their employment.  *Id.,* n. 5.

To the extent plaintiff has asserted claims against Cantey and the Board based on Smallwood's alleged assault and battery and/or intentional interference with contractual relations, the court similarly finds the claims are precluded by the GTCA.

### b. Negligence Claim

Under the GTCA, a state or political subdivision is liable for loss resulting from its torts or torts of its employees acting within the scope of their employment "subject to the limitations and exceptions specified in this act." 51 O.S. § 153(A).  The state or political subdivision is *not* liable, however, for acts or omissions of an employee acting outside the scope of his employment. *Id.*

The Board of County Commissioners asserts liability is precluded by 51 O.S. § 155(24), which provides immunity to the state and political subdivisions from suit for claims arising from the "[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility…." 51 O.S. §155(24).  "The exemption from tort liability as provided in Section 155(24) is all inclusive for tort claims." *Gibson v. Copeland,* 13 P.3d 989, 992 (Okla. App. 2000) (citing *Medina v. State,* 871 P.2d 1379 (Okla 1993)).  In *Medina,* the court stated:

> Reading the three clauses of § 155(23)[12] together reveals an intent to withhold the waiver of sovereign immunity or any loss or injury, whether to an inmate or other person, resulting from the operational level acts required to furnish the services of a penal institution, including the construction and repair of the facility; the security of the facility; the employment of personnel; the utilities and furnishings of the facility; the food, clothing, items for hygiene and other basic personal items needed by inmates or other persons; the educational, rehabilitative, communicational, recreational and medical and health services or any other service provided for inmates or other persons; the assignment of an inmate to a facility or a cell; and the release of an inmate; with the single exception of loss to persons not in custody caused by an accident involving a motor vehicle operated by the Department of Corrections.

---

[12] The provision is now § 155(24).

871 P.2d at 1384, n. 13.[13]  Courts have held that § 155(24) immunize prisons and jails from a wide array of inmates' tort claims, including claims for personal injuries from other inmate's negligent operation of a chain saw, *Purvey v. State,* 905 P.2d 770 (Okla. 1995), a slip and fall injury, *State v. Burris,* 894 P.2d 1122 (Okla. 1995), failure to provide medical treatment, *Redding v. State,* 882 P.2d 61 (Okla. 1994) and negligence by prison guards in their removal of a prisoner's handcuffs and leg irons.  *Washington v. Barry,* 55 P.3d 1036 (Okla. 2002).

The court concludes that plaintiff's claim for negligence is precluded by § 155(24) of the GTCA under controlling Oklahoma case law inasmuch as it arises out of plaintiff's detention in the Mayes County Jail.

### 5. Punitive Damages Claim

The Board and Sheriff Cantey also seek summary judgment on plaintiff's claim for punitive damages.  Plaintiff has not responded to this argument.  A municipality or political subdivision is immune from punitive damages under 42 U.S.C. § 1983.  *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981); *McKee v. Heggy,* 703 P.2d 479, 483 (10th Cir. 1983). Likewise, the GTCA prohibits an award of punitive or exemplary damages against a political subdivision for claims arising under state tort law.  51 O.S. § 154(C).

Therefore, the Board and Sheriff Cantey are entitled to summary judgment on plaintiff's claim for punitive damages.

---

[13] Plaintiff asserts *Medina* stands for the proposition that § 155(24) immunizes only state prisons and not county or municipal jails.  Although *Medina* involved a negligence claim against the state based on an incident at a state correctional facility, the court's decision contained no language limiting the applicability of § 155(24) to state-run facilities.  The statute—by its plain language—applies to "state and *political subdivisions*" operating "any prison, *jail* or correctional facility."  51 O.S. §155(24)  (emphasis added).

### IV. Conclusion

For the foregoing reasons, the Motion for Summary Judgment of defendant Smallwood, in his individual capacity [Dkt. # 64] is granted with respect to plaintiff's claim for § 1983 violation based on the strip search of plaintiff, negligence and his common law claim for intentional interference with contractual relations and denied with respect to plaintiff's claim for § 1983 violation based on use of excessive force,  and his common law claim of assault and battery.

The Motion for Summary Judgment of the Defendant Board of County Commissioners, Sheriff Cantey in his Official Capacity and Cevin Smallwood in his Official Capacity [Dkt. #63] is granted.

The claims remaining in this case are Count I against Smallwood in his individual capacity for violation of § 1983 based on Smallwood's alleged use of excessive force and Count IV against Smallwood for assault and battery.

ENTERED this 10th day of May, 2012.


GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT